Well, good morning to everyone. And on behalf of my colleagues, Judge Bybee and Judge Desai, welcome to the Ninth Circuit. We are here for oral argument in the case of United States v. Nasri. Counsel have 15 minutes aside. Counsel, can you both hear me? Yes, Your Honor. Yes, Your Honor. Great. All right. Counsel, for the appellant, whenever you are ready. Good morning, Your Honors. And may it please the court, Ed Williams from BORG on behalf of claimant appellant, Mr. Younes Nasri. I would like to reserve two minutes for rebuttal. The United States asked this court to conclude that the rights to any property anywhere in the world may be adjudicated by a federal court without any possession or control of any kind, so long as the property is allegedly connected to some crime in the jurisdiction. That extraordinarily broad grant of federal court jurisdiction has at least three issues requiring reversal. First, it is inconsistent with the Constitution's due process clause. Second, it is inconsistent with the Supreme Court's unbroken line of cases, holding that in-rim jurisdiction requires actual or constructive possession. And third, it raises significant Article III concerns. As recently as in James Daniel Good real estate, the Supreme Court located the requirements for in-rim civil asset forfeiture actions in both the Fifth and Fourteenth Amendment due process clauses. In that case, which was decided after the current language in Section 1355B was enacted, reiterated that in-rim jurisdiction requires actual or constructive control over the race. So counsel, you, I take it, acknowledge that if you're right, that that is entirely inconsistent with our prior cases, 1.67 million in Petro-Saudi, where we held the exact opposite, right? Your Honor, I would disagree. I don't think that this court reached the Constitutional due process question and approximately 1.67 million are Petro-Saudi oil or all by E. But we did hold that actual or constructive control is not necessary, correct? The court in approximately 1.67 million stated that it did not believe that constructive control was required for foreign civil asset forfeiture. I think that's a statement from the court, but there are a couple of things that are important to note about that case. One, the court in approximately 1.67 million actually had what we don't have here, which is a court order from the Cayman Island High Court restraining the funds. So that's the particularly would you agree that we are bound by 1.67 million? I believe this court is bound by 1.67 million to the extent it interprets the statutory question, but I don't believe this court is bound by 1.67 million to the extent the court believes it answers the Constitutional question, but it doesn't even purport to answer. So let me ask you this. If you agree, and I think you just acknowledge that you do, that we are bound by 1.67 million, at least to the extent that it held what it held us to the statutory text, would the better course of action be to overrule 1.67 on bonk for our court to reconsider that decision on bonk to clarify this issue, which I think as you were just starting to argue was not squarely before our court in 1.67 million? Two responses. First, to the extent the court believes it cannot reach the Constitutional question because 1.67 million answered the statutory question, yes, on bonk would be the best course for review of that particular decision. I don't believe that 1.67 million forecloses the Constitutional question, but I would understand that this panel took a different view. But I want to offer a second lens on 1.67 million, which actually comes from the Supreme Court's recent decision in Folk. So even if you assume that Congress may alter the personal jurisdiction requirements for in-rim jurisdiction, which it has not purported to do, Folk is particularly instructive about what Congress must do and how expressly Congress must do so in order to alter long-standing personal jurisdiction requirements. And so I think that Folk disturbs 1.67 million, and in my view, 1.67 million is irreconcilable with Folk's discernment about what Congress must do when it wishes to alter personal jurisdiction requirements, and it did not do so. So, counsel, on that point, I'm looking at your most recent supplemental brief, and I'm looking particularly at pages 18 and 19 of that brief, and you talk about how the statute in this case, by contrast to, I guess, Folk, creates jurisdiction over an expansive and open-ended universe of claims in 1355b2, and then you go on to say that this does not reflect the branch's balanced judgment about fairness. So I take it that what you're saying is that Congress did purport to do this, but they didn't do it using balanced judgment. They exercised their judgment in passing this statute in an unconstitutional way, and we should say that directly. We should say, we in the judiciary will review the political branches who are speaking in one voice in 1355 and make our own judgment that this wasn't balanced on their part, that we don't think they looked at the right things in passing this statute, that they just got it wrong here and we're going to overrule them. That's what you're saying in your brief, yes? I don't think that's quite what we are attempting to articulate, Your Honor. I think that what we were trying to say there is that if you look at the PSJBTA, which was at issue and fold, you have expressed statutory language that says that according to Congress's view, persons who meet the requirements under the PSJBTA are deemed to have consent to personal jurisdiction. You don't have that kind of clear language in 1355b. I don't see that, because I see in 1355 and in 1.67 million, Judge Wardlaw, in her opinion, cited Judge Alfonso D'Amato's legislative history, but the statute says whenever property subject to forfeiture is located in a foreign country, an action for forfeiture may be brought, as provided in paragraph one. So I don't understand what Congress could have been clearer of when they say whenever property subject to forfeiture is located in a foreign country, forfeiture may be brought. So what is it that Congress was supposed to say in this statute that in your view would have worked? Again, Congress could have mirrored the language in the PSJBTA and said expressly that 1355b was conferring personal jurisdiction over the in-room proceedings. It does not do that. In fact, 1355b reads as a venue statute, as a venue provision, whereas 1355a reads as a jurisdictional provision. I also want to address, Judge Bennett, your statement about the senator from New York's which is the only legislative history I've seen cited in numerous court decisions about what 1355b is supposed to be doing. If we accept the senator from New York's statement about Congress's attempts, one senator's statements about what Congress is trying to do here, you have to accept the rest of his statement, which is that Senator D'Amato believed that even in in-room jurisdiction, international civil forfeiture actions, there would still be minimum context required in order to fluctuate. So basically, we should re-read the legislative history and rule that Judge Wardlaw, in her opinion, and Judge Wardlaw's panel just read the legislative history wrong. I don't think I'm suggesting that they read the history wrong. I'm suggesting that Senator D'Amato does say that he believes that section 1355b is altering the rules for constructive control. But I'm saying if you accept Senator D'Amato's first piece, which is that 1355b changes constructive control, you have to accept his second piece, which is he believed you required minimum context. And this court's decision in Obaid forecloses minimum context or the consideration of minimum context. And you've already said in your briefs in this case that Obaid or Obaid, whatever the right pronunciation is, was wrongly decided. And that Judge Rawlinson, I was also on the panel, just completely got it wrong, and that our decision should be overruled in bank. You, I guess, conceded in your briefs that even though we got it dreadfully wrong, our three-judge panel can't overrule it, that that has to be an in-bank court, yes? Yes, as far as the minimum context review, that I believe that that is foreclosed. We don't believe that what's foreclosed is the constitutional question of whether constitutional due process requires actual or constructive possession of the race to be consistent with interim jurisdiction. And even, Your Honor, I know I'm running short on time, even if the court were to believe that it was foreclosed on a due process question, the Article 3 concerns are still particularly present on the surface of this case. What the government's position is, is that even if the government of a foreign country said they were expressly going to reject the order of a United States court, in the government's view, the court would still have jurisdiction to adjudicate the rights of that foreign property vis-a-vis the That is an extraordinarily broad grant of jurisdiction that is inconsistent with the job of federal courts to advise, not to issue advisory opinions. Has Lichtenstein said that here? The only statement we have from, we don't have any statement from Lichtenstein. What we have is. So, but we don't have a statement of Lichtenstein saying, United States, we don't want to hear from you on this money. Go away. That's correct. But you also don't have here what you had in approximately 1.67 million, which is a high quarter from the Cayman Islands, or what you had in Petro Saudi oil, which is an order from the high court of the UK, or what the Fourth Circuit had in Batado, which was an order from the high court of Hong Kong. And so the usual order, the reason we are here is because the usual order of events from the federal government wants to seize foreign property, is they go to the foreign government and their courts and get a restraining order. We don't know. This is why I believe the court and has now withdrawn opinion from managing the district court. We don't know what the Lichtensteinian government's position is with respect to the burden of the bank funds. And the reason we don't know is because the only statement about restraint is in the FBI agent's declaration attached to the second amendment complaint for civil asset forfeiture, paragraph 21, which says that Lichtenstein has restrained the funds. We don't know if that is a result of comedy or if as is required. And again, going back to 1.67 million, what 1.67 million says is that when a foreign government restrains funds through a restraining order or issues a high court order, it is acting as the agent for the federal government. That's what gives it constructive possession. We don't know in this city and government. Council, how much proof of cooperation would we have to have? So if there was a communication between, let's say, the State Department or the Justice Department and, let's say, the Attorney General of Lichtenstein saying, would you seize these funds? We'll have proceedings, hope to have a court order. And Lichtenstein says, yes, we'll hold the funds. Is that going to be I want to be careful about getting too close to the contours, but I'll tell you what, one, what this court has said in previous cases is at least or at least been suggesting about the facts of previous cases is that a high court order is the kind of the for sure answer. If you have a high court order, then you definitely have constructive possession. Whether something less than that creates constructive possession, I'm hesitating to demarcate, but I do think that some what ultimately has to be believed by the district court is that its order will be effectuated and that that's how you both deal with the due process problem and the article three problem. OK, so so what happens what would happen if a high court of Lichtenstein says, yes, we can we will we will order you to hold this, but we won't guarantee that the order from the U.S. will be satisfied in full. So let's suppose that the high court of Lichtenstein says, yes, we'll hold this and we'll consider the U.S.'s claim, but that claim must be considered. Let's suppose let's suppose that Thailand had had dealings with Nasri as well and has its own forfeiture laws and goes to and goes to Lichtenstein says, well, as long as you're freezing the funds, we'd like we'd like some claim on this for all the damage that Nasri did as well. Now, if if if something less than full control by the U.S. is what's going to be made available in Lichtenstein, will that satisfy will that satisfy the due process clause? I think so, your honor. I don't think full I don't think the the existence or the possibility of future proceedings in the foreign country forecloses constructive control. And I think Petro Saudi oil, to some extent, teaches this there. There was an arbitration order that was at issue in the U.K. court. The U.K. had issued an order. The U.K. high court issued an order restraining the funds for the purposes of waiting on the adjudication from the U.S. court. But my understanding of that proceeding is that there were further going to be anticipated future proceedings. And that doesn't foreclose the presumption of constructive control, which you don't. The reason that I ask counsel is that as as you may have seen in in my separate opinion, this feels more like a quasi and ram action, which we all we're doing is here is deciding as between us and Nasri that we have a superior claim to title, which Lichtenstein may or may not honor in full. If we have the property in our control, then we can declare title as against the world. And all of the funds come to the United States. So that's why I ask about about whether Lichtenstein would still be a big would still have the power to sort of divide this up and say, OK, yes, you get a million dollars, but there's other other claimants here. So you don't have full title to the to the funds here, whether that would satisfy due process. Well, your honor, I'm inclined to agree with you as much as possible. And but the quasi and ram proceeding here is not available is foreclosed by Supreme Court and Ninth Circuit precedent that that civil asset forfeiture proceedings are in proceedings. And so I think that the question of whether these civil asset forfeiture claims are more akin to quasi and ram because there are a limited number of potential claimants and the rights are being adjudicated vis a vis those limited number of claimants. That sounds right to me, your honor. And I think I agree with it. But I think that that question is foreclosed both by Ninth Circuit and Supreme Court precedent. And I see what that might time at this point has expired. But I'm happy to answer the other questions before I sit down. I have I have one or two other questions and we will give you at least at least your full two minutes or a rebuttal. We've taken up a lot of your time with questions. So as far as you know, your client is still outside the jurisdiction of the United States. That's correct, your honor. All right. And in terms of notice of these proceedings in the district court, you concede your client had full notice of the United States's desire to seize these funds. I concede that the that our client had actual notice, whether he was not serve person or in the context of a service, but he did know that the proceedings were occurring and did hire counsel for the purpose of being able to adjudicate the funds. That's that we had actual notice and a full opportunity to be heard both in the district court and in our court. Yes, your honor. But I think if the place you're going with this is that that satisfies due process requirements for interim jurisdiction, I disagree. So that's where the line of thinking is going. I just wanted I just wanted to make sure that you agreed that your client had actual notice and a full opportunity to be heard. So unless my colleagues have any further questions, we'll turn to the government. Thank you, your honor. Thank you. May it please the court. Daniel Zip on behalf of the United States. Your honor, the Supreme Court's decision in full fundamentally altered this court's approach to the due process issues. In this case, the court made it clear that the due process principles of the 14th Amendment are driven in part at least by interstate federalism concerns and that it makes little sense to mechanically import those same limitations into the Fifth Amendment due process analysis. Therefore, the court identified a narrow class of cases where Congress has specifically provided for federal jurisdiction where the distinction between the Fifth and 14th Amendments matters. This is one of those cases Congress specifically passed 1355 with the intention of making it easier to seize foreign assets and criminal proceeds from crimes committed in the United States, even if those were located abroad and even if the court did not have personal jurisdiction over the defendants. Can I ask you, Judge Bybee? No, and get your thoughts on if there were a corporation in a foreign country that was manufacturing fentanyl, for example, and the government decided that because of the transfer of that drug into the United States into a particular jurisdiction, violated some sort of some law. And in fact, they charged that foreign corporation with drug trafficking. Could the government forfeit the manufacturing plant that's located in that foreign country under 1355? In your hypothetical, if all the requirements of 1355 were met, in other words, if there were sort of acts or a mission giving rise to the forfeiture that occurred in the United States and that or the venue for the forfeiture was in the United States, yeah, under the plain language of the statute, it would apply to criminal proceeds. So you would agree that without taking any steps to obtain any sort of control or constructive control or seize the physical plant, the United States would not file an action under 1355 and seek to forfeit the physical manufacturing plant of a corporation in a foreign country. I don't know that the analysis would be different than if there was funds that were, as long as it were the company or the manufacturing facility itself was involved in acts or missions giving rise to forfeiture in the United States. If your answer and I expected you to say that because I think that's sort of on all fours with what we're talking about here. Are you asking us to adopt the theory that the Supreme Court declined to adopt in full and that is that the Fifth Amendment poses no territorial limits on personal jurisdiction at all? No, Your Honor, we're not asking for the sort of maximalist approach for the same reasons solicitor general did not enfold. What our position is that the specific statute in this case is similar to the statute in full and that it is similarly narrow and that it applies only to a narrow category of claims. In this case, fine penalty or forfeiture and not a myriad civil liability actions that the jurisdiction triggering predicates are narrow and that it only applies when there's actual acts or missions occurring in a district in the United States and that it's tied to specific conduct that implicates foreign international relations. Again, this was a statute that was specifically passed to address the problem of criminal I'd like you to turn to 1355 B2 and let's read this together. Okay, so as you saw in my separate statement, I suggested that the history of this really had less to do with foreign proceedings than it did with Rule 4k of the Federal Rules of Civil Procedure, which usually obligates federal courts to abide by the rules of the states. That is that it's that it requires them to observe the due process constraints that are in the 14th Amendment because they only have they only can exercise jurisdiction as broad as the state in which they sit. Okay, are you with me? And so this problem addresses a situation in which, for example, a plane has been seized in one state, but was connected to another state and the jurors and the United States has chosen to bring it in first state. That is the state where the plane is used to be located, but is no longer located under 4k prior to this statute that that that jurisdiction could not exercise in-rem jurisdiction because the plane was in a different district. This would close that gap and to say no, the United States as a whole has in-rem jurisdiction over the plane. And so the seating in one district is good, even though the plane is physically located in a different district. Okay, so that this clearly closes that gap. Now, with respect to the foreign country, this says property subject to forfeiture. That doesn't say the property of property that is located in a foreign country can is subject to forfeiture. You've reversed the it's been interpreted. It says property subject to forfeiture. That's the ordinary general law. That is property that in foreign country that is now being possessed by the United States. That would be property seized on the high seas would be located outside the United States, but under the ordinary maritime rules now is physically occupied by the United States. It would also include property that might have been seized in the conflict, but is residing overseas. But you've read this to say irrespective of whether the U.S. has any connection to this property whatsoever. We can seize it. Why is that a good reading of B2? You moved the subject to forfeiture to later in the statement. Well, I guess my first response would be it wasn't us that had that reading. It was this court in 1.6 million. I'm asking you to help me read this now because you have adopted that as your own and you urged it on that court. Right. Because that was that was your that was your reading. I mean, you the government generally, that's exactly the reading that you were just to take property subject to forfeiture there. Doesn't that mean property subject to forfeiture under the ordinary rules of forfeiture? Why wouldn't that be under the ordinary rules of in rem jurisdiction? Your Honor, you've now said property, whenever property is located in a foreign country, it is subject to forfeiture. Right. And again, and it's based on this court's specific holding that in rem jurisdiction over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property owner is is proper. I'm not sure that we've added quite a bit of language to the statute. Well, I guess I don't have a specific response to your court's to your honor's analysis of B2. Our reliance was on this court's case law interpreting the statute. And we believe that the three judge panel should be bound by that that that binding case law. Okay. So continuing with the fold framework in this case, on the first instance, it fits within the narrow categories that do not exceed the Fifth Amendment due process restrictions. This also raises the same political questions that were at issue in fold where the court warned not to cavalierly interfere with delicate judgments on matters of foreign affairs. This is a case where both the executive and Congress have spoken with one voice. And it's in fact, arguably, more implicative of those rights because the Congress in this case actually allowed for the executive to be seizing the property at issue, whereas in fold, it was providing the rights of private citizens to pursue suits, I guess, I guess, also, in your view, the reading that, for example, our court took of this statute was some 17 or 18 years ago, and Congress has not chosen to in any way change the statute in light of our reading or other courts reading. That's correct, your honor. So we fundamentally believe to answer Judge Desai's question earlier as whether we need to take 1.6 million in those cases en banc to reconsider, our position is no, because they were correctly decided. And that's even more clear after the court's decision in fold, which... Let me ask you this, counsel. Assuming for just a moment that I think we can decide the due process question without overruling 1.67 million, would you have the same view that we shouldn't reconsider 1.67 million anyway, because it then at a minimum creates a tension between the sort of statutory question that was asked and 1.67 million versus the due process question that's presented here? If the court issues the same opinion that it did the first time, we moved for rehearing en banc based on that decision. So if it's something to the effect of importing the 14th Amendment due process concerns into the in rem jurisdiction analysis, which we believe is incorrect, then yes, that would create enough of a tension with the existing case law that it would likely be something that the en banc court would need to clear up. But again, it's our position that that holding from the original decision, which sort of used the 14th Amendment to find this control as notice requirement under due process was founded on these 14th Amendment cases that dealt with the concerns over interstate comedy and federalism. Once you take those out, and as Fold made clear, you should, and we're strictly talking about the Fifth Amendment due process rights, then the framework from Poole provides the proper basis for this court to analyze. Counsel, out of Fold, what constraints does the Fifth Amendment impose here? So I think the court adopted the two, basically. The first was the statute itself has to be sufficiently narrow across three metrics so that it is not extending the federal government's jurisdiction in violation of due process. That was the narrow category of claim, the triggering predicates, and conduct implicating international relations. Then the court separately declined to apply, but said if it did apply the reasonableness standard from Asahi, which asks sort of balances the burden on the defendant versus the interests of the forum state and the plaintiff. It's our position that in this case, if the court did both of those, even the reasonableness test would not support finding a due process violation in this case. That's because the burden on the defendant was not unfair in this case. He received actual notice. He retained a lawyer. He entered an appearance and had notice and opportunity to be heard. Counsel, let me stop you there. If this were only about Nasri, I might well agree with you on that, but the problem is that you're proceeding in rem. That's an action against the world. What about everybody who's not Nasri? I think the problem is that it's his case here, and he can't assert the interests of other parties. But you're asking us to issue a judgment in rem. That has particular characteristics to it. It's a declaration of title against the world, and so you've got to satisfy whatever remaining shell of due process requirements are left after fold. I read the court as saying you've at least got to give them notice, which the statute in fold easily did because it named the parties. That's not true of this statute and the reasonableness, whatever we're going to get out of Asahi, which was a 14th Amendment case. But if we're going to do that, you're asking us to give an in rem judgment. How can we do that against the world and declare U.S. title good? Well, two answers. One, the record shows that the United States did in fact provide notice under Supplemental Rule G, and obviously Mr. Nasri received notice. And two, it's his burden. If he's arguing that this is a violation of due process, he has to show that it was his due process that was violated. And any of the other claims that might come in, it's been I think seven years now and the funds are still frozen and no one's claimed them. But if there were someone else out there in the nether that wanted to claim those, their claims would be directly contrary to his. And under Elk Grove, the Supreme Court made clear that you can't assert due process or constitutional claims for other third parties if they're opposed to you. Did the district court look at the notice provided under Supplemental Rule G? No, the record is somewhat limited, but it makes clear that we did provide notice, published notice, and then provided... And where was it published? I don't believe that's in the record, but I think it would have been consistent with the rules and probably online given the nature of the... We're just supposed to take the government... There's been no inquiry, no findings of fact by the district court. Because Mr. Nasri received actual notice, and the law is clear that even if there were some defect in how we went about complying with Supplemental G, once a defendant receives actual notice... But did everybody else get actual notice? Again, this is an in-rim proceeding. Counsel, you keep arguing this as though it's an in-personam proceeding. It's not. Well, Counsel, I assume your argument remains the same as in your briefs, that what we are dealing here is with Mr. Nasri's claims, and Mr. Nasri does not have the right to assert claims for the rest of the world. That's correct, Your Honor. I think we were going in circles there, but that's our fundamental position is that this is his challenge to the statute and to the due process as applied to him. And the idea that there might be someone else out there that had a claim contrary to his does not provide a sufficient basis for a due process claim. Thank you, Counsel. Do my colleagues have any further questions for the government? All right, Mr. Williams, thank you. We'll give you your two minutes. Thank you, Your Honor. I'd like to address FOLD since that is the intervening Supreme Court decision prior to this Court's argument. FOLD either says nothing about what should happen in this case because it doesn't disrupt the requirement of constructive or actual possession in NREM jurisdiction cases, or it has quite a bit to say about what Congress must do in order to alter longstanding traditional jurisdictional requirements. If the first view carries a day, then this Court's withdrawn opinion remains an accurate view of the constitutional due process requirements. And if FOLD does alter the jurisdictional requirements, then it alters them in a particular way. It confirms that a clear command is what is required for Congress to alter longstanding jurisdictional requirements. There were seven votes in FOLD for the idea that some due process limitations in order for personal jurisdiction to be altered. And a couple of them are it must expressly state that the statute is conferring personal jurisdiction as the PSJVTA does. It ties federal jurisdiction to conduct closely related to the United States. It implicates foreign policy concerns. Counsel, would it be enough? I mean, I take your argument to mean that there is still this backstop of the reasonableness inquiry that needs to occur. Are you drawing lines around what that should look like? What exactly would an opinion by this Court say if we were to adopt the second argument that you're making, which is that it still fails under the reasonableness argument? What is the test? Because I don't read FOLD to have put forth a test. I agree with you, Your Honor. I think that what I'm trying to say, and I apologize if I'm not being clear, is that if FOLD stands for the proposition that Congress may alter longstanding personal jurisdiction requirements for in-rim jurisdiction, which to be fair, FOLD is not an in-rim case. It's an in-personum case. But if it is standing for that proposition, then it says fairly clearly based on the specificity of the PSJVTA and kind of an idea that you can go no further than this, at least yet, to be consistent with due process. The Supreme Court also hasn't set the outer boundaries for Fifth Amendment due process. It said PSJVTA is in. We're not sure what's out. But 1355B is not the PSJVTA. It is not nearly as clear. It is not nearly as specific. It does not provide nearly as clear a command. What I was going to say just for my last two seconds is that while there were seven votes for the idea that there's no maximalist view, there were nine votes for the idea that there's a clear command. In fact, Justice Thomas ends his concurrence by saying that Congress unmistakably overrode what did the prior or international law rules that pre-existed the decision. There's no unmistakable overriding in this case. And with that, we ask the court to reverse. All right. We thank counsel for their arguments. The case just argued is submitted. And with that, we are adjourned for the day. The court for this session stands adjourned.
judges: BYBEE, BENNETT, DESAI